## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

-------------------------------------------------------

| | |
|---|---|
| **IBRAHEEM SAMIRAH, DDS,** | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Case No. 8:21-cv-00829-TDC** |
| | ) |
| **DISTRICT SMILES, PLLC, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

_____

## FIRST AMENDED COMPLAINT

**(Discriminatory Pay, Breach of Contract, Unpaid Wages, Retaliation)**

**COMES NOW** the Plaintiff, Ibraheem Samirah, and, in support of his

cause of action, states as follows:

## I.      NATURE OF ACTION

1.      This is a suit by Dr. Ibraheem Samirah ("Dr. Samirah" or

"Plaintiff"), a former employee of District Smiles, PLLC d/b/a/ "District

Smiles," alleging unlawful and discriminatory denial of pay, retaliatory

discharge and retaliatory counterclaims, under various statutes and common

law theories..

## II.  JURISDICTION AND VENUE

2.      This Court has subject-matter jurisdiction over this Complaint

because this action arises under the District of Columbia Code 1981, § 11-921,

and the District of Columbia Human Rights Act, District of Columbia Code, § 2-1401.01 et seq.

3.      Venue properly lies in this Court because it is the law of the case.

## III.   PARTIES

4.      Plaintiff Ibraheem Samirah is a dentist and practicing Muslim. He is Palestinian of biracial Afro-Arab lineage and identifies as Palestinian, Arab, and Black.

5.      Dr. Samirah was previously employed by Dr. Maryam Seifi and her limited liability companies, Maryam Seifi, DDS PA d/b/a StarBrite Dental and District Smiles.

6.      Defendant Maryam Seifi is a dentist the sole owner of both StarBrite and Defendant District Smiles. Defendant Seifi is a native speaker of Farsi who was born and raised Muslim in Iran until adulthood and is now a follower of Scientology. Dr. Seifi was an "employer" to Dr. Samirah within the meaning of D.C. Code 2-1401.02(10).

7.      Defendant Nina Kimmel is Defendant Seifi's daughter and is the Chief Operating Officer and Chief Financial Officer of both StarBrite and Defendant District Smiles, who also follows Scientology. Ms. Kimmel was an "employer" to Dr. Samirah within the meaning of D.C. Code 2-1401.02(10).  , and.

8.      Defendant William Powell, Defendant Seifi's husband and Defendant Kimmel's stepfather, is Black and non-Muslim.  He is the Office Manager of District Smiles. Mr. Powell was an "employer" to Dr. Samirah within the meaning of D.C. Code 2-1401.02(10).

### IV.          EXHAUSTION OF ADMINSTRATIVE REMEDIES

9.      No particular administrative remedies need be exhausted under any of the statutes and doctrines pled herein.

10.     This Complaint is also timely under all applicable statutes of limitation, since the hostile environment and unlawfully denied pay inflicted against Dr. Samirah culminated in his termination on June 17, 2019, and this action is filed less than 365 days thereafter.

11.     Plaintiff Samirah's claim alleging Retaliatory Counterclaims is also timely filed.

### V.          STATEMENT OF FACTS

**Dr. Samirah is Employed at StarBrite**

12.     Beginning in July 2018, Dr. Samirah worked for Defendant Seifi's Maryland company, Maryam Seifi, DDS PA d/b/a StarBrite Dental ("StarBrite"), as a dentist.

13.     Initially, Dr. Seifi hired Dr. Samirah for a trial period in July 2018.

14.     Upon determining that Dr. Samirah was well-qualified, Dr. Seifi offered him a full-time position at StarBrite at the beginning of August 2018.

15.     Defendant Nina Kimmel, Dr. Seifi's daughter and StarBrite's administrator, offered Dr. Samirah what she represented as a better employment opportunity working at Dr. Seifi's District of Columbia practice, Defendant District Smiles, PLLC ("District Smiles").Dr. Samirah's transfer to District Smiles was contingent upon being "properly trained" at StarBrite.

**The Discriminatory Atmosphere at StarBrite**

16.     Defendant Seifi is a native speaker of Farsi who was born and raised in a Muslim family in Iran until adulthood.

17.     In various conversations, Dr. Seifi revealed to Dr. Samirah that she follows Scientology.

18.     Defendant Seifi has exhibited hostile views against religious Muslims such as Dr. Samirah.

19.     Thus, beginning in his first two weeks of work at StarBrite, Kimmel and Seifi, both Iranian American, repeatedly mispronounced Dr. Samirah's first name, Ibraheem, to insult Dr. Samirah.

20.     The name "Ibraheem," often spelled "Ibrahim," is a very common name in the Middle East region, including in Iran.

21.     The name emanates from the Qur'an.

22.     Nevertheless, Defendant Seifi disparagingly mispronounced Dr. Samirah's first name for the following eleven months, insisting on calling him by

4

the Anglicized "Abraham" to negate his identity, including in the presence of her subordinates, and even after Dr. Samirah corrected Defendant Seifi repeatedly.

23.     During Dr. Samirah's first week of work at StarBrite, Defendant Kimmel asked about the origin of Dr. Samirah's name.

24.     Dr. Samirah explained to Kimmel that Dr. Samirah is Palestinian and that his first name is the Arabic version of Abraham.

25.     Defendant Kimmel replied that she is Iranian and Muslim like her mother, Defendant Seifi, and that she celebrates Eid.

26.     Defendant Kimmel then queried whether Dr. Samirah drank alcohol, referencing that practicing Muslims often abstain.

27.     Dr. Samirah responded to Defendant Kimmel that he does not consume alcohol.

28.     Defendant Kimmel replied, "We get together in the office and drink sometimes. That's why I was asking."

29.     At one point, Defendant Kimmel said her family was "technically Muslim."

30.     Defendant Seifi said this once as well.

31.     In or around July 2018, Defendant Kimmel asked Dr. Samirah if she could call him "Abe" as a nickname.

32.     He informed her that this would be a nickname for the name "Abraham," which was not his name.

33.     Dr. Samirah said that she could call him "Ib" for short, but she preferred to call him "Dr. Abraham" instead.

34.     Despite explaining to Defendant Kimmel what she already knew, that Dr. Samirah's name is pronounced exactly as it is spelled, Defendant Kimmel rudely insisted on negating Dr. Samirah's identity, calling him "Dr. Abraham" for the next eleven months.

35.     Dr. Samirah corrected Defendant Seifi's and Defendant Kimmel's mispronunciations approximately 15 times in total within the first two weeks of work.

36.     Other office personnel began to mispronounce Dr. Samirah's first name in the same way that Defendant Kimmel and Defendant Seifi distorted it.

37.     Dr. Samirah interacted with these office personnel, too, through October 2018.

38.     In or around July 2018, Dr. Samirah was wearing a significantly long beard, which reflected his Muslim identity.

39.     Celine Figueroa, the StarBrite office manager, declared to Dr. Samirah, "People might think that you're a terrorist," apparently referencing his appearance.

40.     Dr. Samirah explained to Figueroa that this can be a very damaging thing to say, as it is a narrative that has caused global harm.

41.     Figueroa defended herself by saying that she was from the south of Paris and that she grew up with "those" people.

42.     She further explained that the south of Paris is a predominantly North African, Arab, and Muslim area.

43.     Dr. Samirah persisted in explaining why Figueroa's statement was unwelcome. He made himself available to elucidate this matter further.

44.     In or around July 2018, at StarBrite, Defendant Seifi, who practices the religion of Scientology, asked Dr. Samirah to read her Scientology books located in the office.

45.     Defendant Seifi implored that reading these would "really help to inform" Dr. Samirah's income-earning strategy.

46.     Defendant Seifi incorporated the Scientologist theology regarding money-making into her business model and wanted Dr. Samirah to follow suit with her Scientology-based practices in her District Smiles office.

47.     Defendant Seifi assigned two Scientology books for Dr. Samirah to read during his work hours at StarBrite, and he complied by reading them.

48.     Defendant Seifi installed a photograph of Scientology founder L. Ron Hubbard in the StarBrite back offices.

49.     Defendant Seifi also reminded Dr. Samirah that she is of Muslim background. He noticed that she never felt the need to point this out to anyone else.

50.     Omer Akmal, the practice periodontist, is Pakistani American and had been at StarBrite longer than Dr. Samirah.

51.     Between July and October 2018, Akmal daily used the n-word in the office backroom to describe Black and South Asian patients and people. He never used it in reference to white people or any other race or ethnicity.

52.     During these four months, Drs. Samirah and Akmal had a number of different conversations.

53.     In nearly every one of their conversations, Akmal said the n-word at least five to ten times and was very vulgar generally.

54.     Thus, Dr. Samirah, an Afro-Arab, was subjected to this racial slur perhaps 50-100 times.

55.     In or around August 2018, while Dr. Samirah was in the backroom, Dr. Akmal was making weekend plans with Ali Eghtesadi, the practice endodontist.

56.     Dr. Akmal relished in the fact that he goes out to bars and clubs on the weekends and that he consumes copious amounts of alcohol.

57.     Dr. Akmal further stated that he is "going to hell" for his alcohol consumption.

58.     Dr. Akmal was aware that Dr. Samirah is a practicing Muslim who does not consume alcohol.

59.     Dr. Akmal's statements otherized Dr. Samirah, who was known at the practice for being the only person who abstained from alcohol.

60.     In or around September 2018, Dr. Samirah confronted Dr. Akmal about his use of the n-word.

61.     Dr. Samirah told Dr. Akmal to stop using the word.

62.     Dr. Samirah explained that it was offensive and that Dr. Akmal had no license, as a Pakistani American, to use it.

63.     Dr. Samirah further described that, as someone of Afro-Arab lineage, he took personal offense to Dr. Akmal's use of the n-word.

64.     Dr. Akmal recounted what it was like to grow up in South Dakota as the only family of color in his town.

65.     Dr. Akmal jeered, "I was the n**** growing up, so I am a n*****."

66.     Dr. Akmal also ridiculed his own parents for their steadfast practice of Islam and said laughingly that his parents were "terrorists."

67.     Dr. Akmal referred to his parents as "super religious" with "terrorist tendencies."

68.     Dr. Akmal further said offensively, "I used to be a sheikh, but ever since I left South Dakota, I don't believe in Islam. I don't like religion."

**Dr. Samirah Protests Dr. Akmal's use of the N-Word to Kimmel**

69.     Shortly after Dr. Samirah confronted Dr. Akmal in or around September 2018, Dr. Samirah raised the matter with Defendant Kimmel, and Kimmel admitted knowledge of what Dr. Akmal was saying, responding: "I know, I know."

70.      Dr. Samirah never heard back from Kimmel that anything was done to stop Dr. Akmal's use of the n-word.

**Dr. Samirah Accepts Employment at District Smiles**

71.    After four months at StarBrite, Dr. Seifi determined that Dr. Samirah was well-qualified in his dental proficiency to practice as Lead Dentist in her District Smiles location.

72.    Dr. Seifi offered the position to Dr. Samirah, noting that he would be the only dentist at her D.C. practice and, as such, he would not need to share the office's daily income percentage with anyone.

73.    Defendants Kimmel and Seifi told him that he would earn more there than at StarBrite.

74.    Toward the end of October 2018, Dr. Samirah transitioned to the District Smiles practice. He worked there from October 2018 through his unlawful termination in June 2019.

75.    Defendant Seifi had opened District Smiles at American University Park more than a year prior and told Dr. Samirah that the practice would flourish once he got there.

76.    Defendants Kimmel and Powell claimed that the previous District Smiles Lead Dentist, Dr. LaShaunda Seaberry – who is Black – was lazy, and that her indolence caused the District Smiles practice to remain dormant for most of her year there.

**Defendants Malign Dr. Samirah Over his Appearance**

77.    On numerous occasions, Defendants criticized the appearance of Dr. Samirah's physique while wearing his scrubs.

78.    Female dental staff were not subjected to the same indignities.

10

**Dr. Samirah's District Smiles Employment Contract**

79.     Defendant Kimmel provided Dr. Samirah with an employment contract proposal for Dr. Samirah's move from StarBrite to District Smiles.

80.     After negotiation, the contract was executed. Ex. 1.

81.     Dr. Samirah's District Smiles contract stipulates that "District Smiles shall offer Dr. Samirah no less than forty-eight (48) hours of clinical working hours each week." See Ex. 1 hereto.

82.     Notwithstanding, in not one of his thirty-four weeks of employment with District Smiles was Dr. Samirah ever provided with the mandatory 48 clinical working hours.

83.     Dr. Samirah's contract further stipulates that he "shall be compensated at a rate of thirty percent (30%) of the net collections of District Smiles less fifty percent (50%) of the laboratory fees associated with District Smiles patients. For purposes of this section, net collections shall mean the total net collections after any merchant fees, discounts and refunds."

84.     Dr. Samirah requested a per diem guarantee when negotiating the District Smiles contract, but Defendants would not agree.

85.     Dr. Samirah negotiated for the 48 clinical hours guarantee, believing that would afford him the requisite compensation.

**Dr. Seifi's Christmas Party**

86.     In December 2018, Dr. Seifi hosted a Christmas party, to which she invited Dr. Samirah.

87.     Dr. Seifi gave Dr. Samirah a gift that said, "Merry Christmas and Happy New Year." Dr. Seifi knew that Dr. Samirah was not a Christian.

88.     Dr. Seifi had not wished Dr. Samirah a Happy Eid al-Adha or Eid al-Fitr, nor did she host an Eid celebration for the practice.

**Seifi and Kimmel Denigrate Dr. Samirah About not Drinking Alcohol or Eating Pork**

89.     On at least three different occasions in 2019, Defendants Seifi and Kimmel raised with Dr. Samirah and teased him about not drinking alcohol or eating pork.

90.     On various other occasions, Defendant Kimmel would look at Dr. Samirah and say: "Go grab a beer," though she knew he would not do so.

91.     In March 2019, District Smiles and StarBrite Dental, both owned by Maryam Seifi, conducted a joint marketing meeting.

92.     Dr. Seifi's two companies shared a marketing expert, Kimmel's husband.

93.     William Powell, Dr. Seifi's husband, and Eliana Figueredo, a dental assistant, worked at both locations.

**Defendants Require Daily Unpaid Labor From Dr. Samirah as a Condition of Continuing his Employment and Generate False Documentation Relevant to his Compensation**

94.     As noted above, Dr. Samirah's three-year contract with Defendant District Smiles only provided for compensation based on the per-patient formula and guaranteed him 48 clinical hours per week.

95.     Nonetheless, during Dr. Samirah's employment, Defendants imposed a demand upon him that, in addition to working paid clinical hours as set forth in his employment agreement, he provide extensive unpaid services daily.

96.     Defendants demanded that Dr. Samirah idly staff the District Smiles facility for hours for which Defendants had failed to fulfill their contractual obligation to provide patients.

97.     For example, Dr. Samirah was required to remain in the "business operations" room, uncompensated, during Defendant Powell's financial presentations to all new patients.

98.     Defendant Powell ordered him to stay in the room to answer any questions from the patient, forcing Dr. Samirah to provide his dental expertise, advice, and skill for free.

99.     Defendant Powell's financial meetings with each new patient lasted approximately 30 minutes and were added into Dr. Samirah's daily schedule, among other things, to give the appearance of a falsely fuller schedule.

100.    Defendants began to create false documentation to cover up their failure to pay Dr. Samirah according to the mandatory contract provisions they had negotiated with him, by generating scheduling documents indicating that Dr. Samirah's dental procedures required much longer appointments than was accurate or customary. For instance, they would attribute 3 hours of clinical time to an appointment that only required 45 minutes' work.

101.    Testifying at the Unemployment Hearing, Defendant Powell denied that this ever occurred.

102.    Defendants awarded Dr. Samirah Panera and Whole Foods gift cards.

103.    Defendants represented that this was for excellent customer reviews. See Ex. 2 hereto.

104.    – This occurred around March 30, 2019, nearly six months into his employment with District Smiles and 9 days before Defendant Powell began secretly documenting against Dr. Samirah to fire him.

105.    Nonetheless, Defendant Powell testified at the Unemployment Hearing that Dr. Samirah was "incompetent."

106.    Defendant Powell alleges that this incompetence was not apparent while Dr. Samirah was working at StarBrite, but that this became apparent only after Dr. Samirah came to District Smiles.

**On April 8, 2019, Dr. Samirah Demands Sufficient Clinical Hours**

107.    On April 8, 2019, just days after he received Defendants' gifts for his performance, Defendant Powell attempted to coerce Dr. Samirah into providing unnecessary dental care to a patient, so as to be able to charge the patient more.

108.    Dr. Samirah refused, as this was unethical and despite the fact that he would collect a percentage of the treatment at a dental practice in which he was deficiently paid.

14

109.    As Defendant Powell insisted, Dr. Samirah told Defendant Powell that Powell needed to stop trying to tell him how to practice dentistry, and instead to focus on doing his own job, as Powell was failing to provide sufficient patients so as to allow Dr. Samirah to complete the agreed-upon clinical hours for which Dr. Samirah was supposed to be paid.

110.    At the Unemployment Hearing, Defendant Powell admitted that Dr. Samirah complained that he wasn't making as much money as a dentist should, but that Dr. Samirah never complained he wasn't getting paid according to his contract.

111.    Dr. Samirah went so far as to assert that he would not be able to continue at District Smiles if these matters were not straightened out.

112.    Defendant Powell subsequently texted Defendant Kimmel about the encounter, distorting what happened.

113.    Dr. Samirah was informed neither of that text's creation nor its conveyance to Defendant Kimmel.

114.    Defendants Kimmel and Powell immediately agreed that Defendant Powell would commence creating written documentation against Dr. Samirah and supply it to Defendant Kimmel.

115.    For instance, on April 9, 2019, Powell wrote that Dr. Samirah arrived 25 minutes late.

116.    At the Unemployment Hearing on June 15, 2020, Powell admitted that Defendants have video showing Dr. Samirah arriving on April 9, but that he had not looked at the video to confirm his assertion.

117.    Thereafter, Defendant Powell wrote numerous "daily reports" to Defendant Kimmel, alleging various misdeeds by Dr. Samirah.

118.    The reports were never provided to Dr. Samirah.

119.    Defendants never interviewed Dr. Samirah about the allegations contained in the reports.

120.    The daily reports contained numerous falsehoods and demonstrate indicia of retaliation.

**Dr. Samirah Opposes Defendant Powell's Bigoted Statements**

121.    On April 18, 2019, Dr. Samirah arrived at District Smiles pleased that the Mueller report pertaining to President Trump had been made public.

122.    Defendant Powell disagreed with Samirah's sentiments.

123.    Defendant Powell asserted that he liked President Donald Trump. He contended, "Yeah, he's racist, but Black people are always out here to get unemployment benefits. They are lazy. Everyone wants to be on welfare."

124.    Dr. Samirah contested Defendant Powell's sentiments and expounded his arguments on systemic issues and other circumstances that might lead someone to be in a desperate situation.

125.    Dr. Samirah again brought up his biracial identity while refuting Defendant Powell's anti-Black statements.

126.    Defendant Powell rebutted that many people do not have good reasons.

127.    Defendant Powell was well-aware of Dr. Samirah's Afro-Arab heritage.

128.    However, he now denies any such awareness.

129.    Indeed, at the Unemployment Hearing, Powell denied ever discussing welfare or unemployment with Dr. Samirah.

130.    Notably, Defendants Powell and Kimmel also called Dr. LaShaunda Seaberry—Dr. Samirah's predecessor who was also Black—lazy.

### Dr. Samirah Protests Defendants' Forced "Sacrifice" of his Income and Discrimination to Defendant Kimmel

131.    After the April 8 and 18 incidents with Defendant Powell, Dr. Samirah protested to Defendant Kimmel.

132.    On May 7, 2019, Dr. Samirah emailed Defendant Kimmel.

133.    Therein he pointed out that on "multiple" occasions, he had brought problems of the "inefficient scheduling mechanism" to "the District Smiles team," Defendants Seifi and Kimmel.

134.    Dr. Samirah again objected to being required to "wait around. . . for work[,]" "sit around," and "wait[] for something to do[,]" on account of "administrative issues."  He added that it was "impractical" to spend "time in the clinic simply hoping that the administration of [his] time as a dentist will improve."

135.    In clear reference to the fact that he was in fact being paid only based on collections and not the 48 clinical hour guarantee, he protested that: "**my income is actively being sacrificed as a result**" of Defendants' failures to provide him with a sufficient schedule of patients.

136.    Dr. Samirah alleged in the first paragraph that his "presence" was being "under-utiliz[ed]."

137.    Importantly, in this same email, Dr. Samirah alleged that 25-minute exams were over-scheduled for an hour-and-a-half.

138.    Dr. Samirah further alleged that, because new patient appointments required that the patient meet with Dr. Samirah, Defendant Powell, and dental assistant Figueredo, Dr. Samirah spent two-thirds of every new patient's appointment "sitting around, waiting for something to do," while uncompensated.

139.    Had Defendants fulfilled their contractual duty to provide 48 clinical hours of work, Dr. Samirah would have had busy days full of appointments.

140.    New patient appointments constituted approximately one-third of the daily schedule.

141.    Dr. Seifi had imposed a "no double-booking" policy in or around March 2019, which meant that Dr. Samirah was not allowed to meet with more than one patient at a time, despite the standard practice being three patients at a time.

18

142.     Defendants ostensibly hoped that this policy, too, would reduce the appearance of damages created by their contract breach.

143.     Dr. Samirah asked to be relieved of coming to the office on Thursdays and Fridays, pointing out that Defendant Powell never once provided enough hours in a week and that there was no functional benefit in requiring Dr. Samirah to merely sit in the office unpaid.

144.     Dr. Samirah continued his email by requesting to be removed from Thursdays and Fridays, so as to compress the meager patient appointments to lesser days in a week so that he would not be forced to drive one-and-a-half hours per just to staff an empty dental practice while unpaid.

145.     Defendant Kimmel responded, also on May 7, 2019, in part, by agreeing that there should be a meeting.

**At In-Person Meeting, Dr. Samirah Reiterates his Opposition to the Failure to pay him in Accordance With the Contract and his Opposition, and Defendants Beseech him to buy District Smiles or Resign**

146.     After May 7, but before May 27, a meeting between Dr. Seifi, Dr. Samirah, Kimmel, and Powell occurred at the back office of District Smiles.

147.     Dr. Samirah stated explicitly that he objected to being required to perform "uncompensated work" and that Defendants contractually agreed to providing him48 clinical hours a week.

148.     Dr. Samirah also stated that racism had been unaddressed.

149.     Thus, he directly protested that Figueroa had suggested he could be a terrorist in a clear reference to his race and religion.

150.    Defendant Kimmel told Dr. Samirah during this meeting that Defendants wanted him to buy the practice or resign.

**When Dr. Samirah Fails to Agree to buy the Practice, Defendants Continue Seeking to Persuade him to do so or to Resign, and Allege Contract Breaches**

151.    On May 27, 2019, having been rejected in efforts to be paid in accordance with the existing agreement, Dr. Samirah wrote to Defendant Kimmel, asking that the formula for his commissions be changed to eliminate certain deductions.

152.    Dr. Samirah further stated his intention to cease working Tuesdays, Thursdays, and Fridays, because District Smiles had continued to provide only paltry clinical hours and had attempted to spread patient appointments out over several days, increasing the amount of time Dr. Samirah was required to sit idly by while fully uncompensated.

153.    The changes would have effectively made up some of the gap between the compensation promised to Dr. Samirah and that actually being paid.

154.    The proposed changes would have also reduced the damage being inflicted upon Dr. Samirah from the time wasted in hanging around District Smiles uncompensated.

155.    Defendant Kimmel responded, however, by refusing to agree to any changes, alleging that *Dr. Samirah* was breaching the contract by "all these changes and other factors" and asked if Dr. Samirah was providing 45 days' notice of resignation.

156.    Dr. Samirah wrote back that there were insufficient patients even for just Sunday, Monday and Wednesday, and asked what "breaches" Defendant Kimmel was referring to.

157.    Defendant Kimmel responded without specifying breaches, but instead asserting that she would have an attorney send him a list of breaches and pestered him again as to whether he planned to resign.

158.    As their correspondence continued, Dr. Samirah said he wished to take off Tuesdays, starting "tomorrow," because he was scheduled to be present from 7:00 a.m. to 4:00 p.m., but Defendants had only scheduled him for appointments between 7:00 a.m. and 9:00 a.m.

159.    At 6:36, Dr. Samirah wrote: "[n]eeding to call in your attorney to find contractual breaches that did not exist until I asked for a pay raise, today, is unnecessary in a team environment. . ." He added that she had asked twice that day for his resignation.

160.    At 6:53 PM, Defendant Kimmel wrote back falsely alleging that Dr. Samirah continued to "insult me, threaten me, make false accusations and use unprofessional language."

**Defendants Demand Again That Dr. Samirah Resign or buy the Practice**

161.    Despite his various protests, Defendants never compensated Dr. Samirah according to the contractual requirement that they "shall offer Dr. Samirah no less than forty-eight (48) hours of clinical working hours each week."

162.     Notably, Dr. Samirah's employment agreement also includes an "Entire Agreement" clause. This clause states, "[t]his Agreement constitutes the sole and entire agreement of the parties with respect to the matters contained herein, and any representation, inducement, promise, or agreement, whether or oral or written, which pertains to such matters and is not embodied herein shall be of no force or effect."

163.     Therefore, Defendants had no justification for their  modifications and breaches.

164.     Dr. Samirah was not provided with a full-time slate of patients at District Smiles and would often complete his long commute only to be provided with minimal work that did not satisfy the contractual terms.

165.     After he strenuously protested the unfair treatment yet again on May 27, on May 28, Dr. Samirah received an email from Defendants' attorney, Mr. Strisik, demanding that he either resign or buy the practice from Defendants.

166.     At the Unemployment Hearing, Defendant Powell characterized Strisik's May 28 email as the first written reprimand provided to Dr. Samirah.

167.     At the Unemployment Hearing, Defendant Powell testified that all the particulars alleged against Dr. Samirah in the May 28 Strisik email were reported by himself to Defendant Seifi and/or Defendant Kimmel.

168.     Defendants still did not suggest grounds or intent to fire Dr. Samirah.

169.    Dr. Samirah informed Defendants that he was not interested in buying District Smiles.

170.    On June 17, 2019, Defendant Kimmel verbally stated to Dr. Samirah over the phone, "Either resign or purchase the [District Smiles] practice."

171.    Dr. Samirah again responded by informing Defendants that he was not interested in buying Defendants' practice.

**Dr. Samirah is Fired**

172.    On June 17, 2019, Defendant Seifi told Dr. Samirah that, effective at the close of business, he was fired.

173.    Defendants now allege that Dr. Samirah breached his employment contract.

174.    To the extent that Defendants later alleged that these "breaches" were a form of misconduct, Defendants never disciplined Dr. Samirah during his employment or warned of any disciplinary action.

175.    Nor did Defendants ever impose a negative performance appraisal upon Dr. Samirah or propose a Performance Improvement Plan.

176.    Indeed, only after he protested race and religious hostility in the workplace, as well as the unlawful pay situation, and insisted that he would not purchase the practice, did Defendants concoct alleged offenses to accuse him of.

177.    Thus, on June 18, 2019, Attorney Strisik wrote to Dr. Samirah, informing him that his employment was terminated effective June 17, 2019.

178.    Specifically, Defendant District Smiles alleged that Dr. Samirah "neglected [his] duties under the rules, regulations and policies of District Smiles and show[ed] an inability to work with and relate to others including District Smiles ancillary staff."

179.    Strisik added the allegation that: "Most recently you improperly accessed patient records and copied phone numbers onto your personal device."

180.    It was only after his repeated requests to address the contract compensation disparity, his protest of a discriminatory atmosphere, and refusal to buy the practice that Dr. Samirah's employment was terminated.

181.    Dr. Samirah was terminated because of the racial, religious, and sexual animus that he faced, his assertions to Defendants Powell and Kimmel of opposition to racial and religious discrimination, and his demand for his contractual compensation.

182.    Defendants' alleged reasons for firing Dr. Samirah are pretextual.

**Defendants Offer a Replacement for Dr. Samirah the Very Compensation he Sought—Even Though she was Straight out of Dental School**

183.    Just after firing him, Defendants made an employment offer to replace Dr. Samirah with a female dentist who was straight out of dental school, and who did not present as Black or as a practicing Muslim, Dr. Mina Jassam.

184.    Defendants offered to pay Dr. Jassam a guaranteed minimum salary of $650 *per day* & 35% of collections, whichever of the two was higher.

185.    Dr. Jassam's percentage offer was commensurate with what Dr. Samirah requested in writing on May 27, 2019, but was denied.

186.    Dr. Jassam's guaranteed minimum offer was consistent with what Dr. Samirah should have received under the contract, but which Defendants never paid on account of not providing sufficient patients, and which Defendants fired him for demanding.

**Defendants Falsely Allege That Dr. Samirah was Fired for Committing Gross Misconduct**

187.    Defendants challenged Dr. Samirah's application for unemployment compensation.

188.    Defendant Powell represented District Smiles at the evidentiary hearing.

189.    Defendant Powell testified under oath at the Unemployment Hearing that Dr. Samirah had committed gross misconduct.

190.    Defendant Powell testified under oath at the Unemployment Hearing that prior to June 15, 2020, he did not know what the Mueller report was.

191.    Defendant Powell testified at the Unemployment Hearing that Dr. Samirah was terminated due to the fact that he was not following the wishes of the owner of the practice.

192.    Defendant Powell admitted at the Unemployment Hearing that Dr. Samirah was not fired for dishonesty.

193.     Defendant Powell testified at the Unemployment Hearing that he was unaware of the contract provision requiring Dental Smiles to provide Dr. Samirah with 48 clinical hours per week, alleging that he had never read the agreement and that no one had ever told him about that provision.

194.     Defendant Powell testified at the Unemployment Hearing that marketing was not a component of Dr. Samirah's duties.

195.     Dr. Samirah is bound to all duties and standards of the practice of dentistry.

196.     It is not at all unusual for dentists to perform *all* parts of multi-day invasive procedures, such as root canals and crown installations, rather than hand them off to other dentists while the procedures are in process.

197.     At the time of his termination, Dr. Samirah still had follow-up dental procedures scheduled.

198.     Dr. Seifi unlawfully and retaliatorily terminated Dr. Samirah's employment mid-day and objected to allowing him to at least conclude the treatments scheduled for the remaining appointments.

199.     Dr. Samirah did not want to abruptly end his patients' care without at least speaking with them directly and relaying any important information—such as that they would need to find another dentist.

200.     Dr. Samirah communicated to Defendants that he had a responsibility to contact his patients before their follow-up appointments. He

had no nefarious purpose; he merely sought to conduct himself professionally. Nonetheless, Defendants obstructed his ability to do so.

201.    The Defendants' counterclaim fails to allege any specific damages because none were incurred, and if they were, Defendants failed to mitigate them.

202.    Defendant falsely asserts Dr. Samirah "took the information . . . to set-up [sic] his new dental practice," although he did not then set up any such practice.

203.    Dr. Samirah did not misappropriate any trade secrets, and even if he did, Defendants will be unable to recover any damages for the Trade Secrets claim, as Defendants have not suffered any losses pursuant to this allegation.

204.    The retaliatory intent behind Defendants' counterclaims is evident, as Defendants only raised alleged contract breaches or trade secrets misappropriation after Dr. Samirah accused Defendants of breaching the contract and statutory violations.

205.    Thus, as noted above, Dr. Samirah alleged discrimination and pay-related contract violations by Defendants, in May 2019.

206.    Defendants then alleged for the first time, that he was supposedly in violation of his contract.

207.    However, Defendants only raised the allegation for the first time within less than 90 days after Dr. Samirah's protected protests.

208.    Defendants also terminated Dr. Samirah's employment within that same 90-day period.

209.    Defendants were served with process on October 6, 2020, including the initial complaint in this matter, which alleges Defendants' violation of various employment rights statutes.

210.    Less than 90 days later, on December 21, 2020, Defendants' attorney Samantha L. Brooks wrote to Dr. Samirah's counsel snarkily in part:

> Dr. Samirah's lawsuit has put our clients in the position of enforcing their right to terminate his employment for cause under the Employment Agreement and thus entitles them to reimbursement for fees and costs incurred in defense of this litigation, including attorneys' fees. We plan to gather and sanitize our invoices associated with the defense of this matter and send them for payment by Dr. Samirah.  Please advise if we should send them directly to Dr. Samirah or to your office.

211.    The most likely possible purpose of Brooks's threat to obtain payment of its attorneys' fees from Defendants' former employee, Dr. Samirah--despite the fact that all of the statutes in question contain provisions for shifting fees in favor of employees, and none contain provisions for reverse fee shifting absent unusual circumstances-- was to interfere with his protected right to bring his appropriate employment claims before the Court.

212.    Dr. Samirah did not yield; he neither agreed to pay the invoices nor drop his case.

213.    So, on February 1, 2021, attorney Brooks wrote to Dr. Samirah's counsel a second time, specifically threatening counterclaims.

214.    Ms. Brooks' letter demanded that Dr. Samirah pay Defendants exactly $43,661.93, reflecting alleged attorneys' fees allegedly incurred by Defendants to that date, in exchange for Defendants refraining from suing Dr. Samirah.

215.    Ms. Brooks threatened that if Dr. Samirah did not pay up, Defendants would sue Samirah for intentional infliction of emotional distress.

216.    Defendants further threatened in the February 1 letter, that a video that was potentially embarrassing to Dr. Samirah but has no relevance to Dr. Samirah's case would "feature centrally in [their] prosecution of the [counter]claim[,]" even though Defendants admittedly did not find such a video until many months after they terminated Dr. Samirah—such that the video undisputedly has nothing to do with the firing.

217.    The allegation that Dr. Samirah intentionally inflicted emotional distress was so baseless, however, that having already used it in attempt to scare Dr. Samirah, Defendants have now abandoned it and do not dare raise it in their counterclaims.

218.    The most likely possible purpose of the threat within less than 90 days of being served with a lawsuit, to file a meritless legal counterclaim against Dr. Samirah and to emphasize a potentially embarrassing but completely irrelevant video, was to interfere with his protected right to bring his appropriate employment claims before the Court.

219.    Indeed, Defendants, by their own later-implied admission, were seeking—within the 90-day period-- to use a meritless counterclaim threat to obtain a release of claims and a $43,661.93 payment from Dr. Samirah, which is the very essence of a retaliatory counterclaim.

220.    Defendants, through Ms. Brooks's second retaliatory letter, also threatened to seek an injunction for alleged misappropriation of trade secrets; however, once its usefulness as a threat to intimidate Dr. Samirah from giving up his suit (as Ms. Brooks' letter demanded) was extinguished, when Dr. Samirah did not fold and pay, Defendants implicitly admitted the absence of a sound legal basis for such a remedy by failing to assert it before this Court.

221.    The most likely possible purpose of the threat, within the 90-day period, to use legal processes to obtain an injunction against Dr. Samirah, was to interfere with his protected right to bring his appropriate employment claims before the Court. Defendant, by its own admission, sought to obtain a release of claims and a $43,661.93 payment from Dr. Samirah, which is the very essence of a retaliatory counterclaim.

222.    While abandoning some of its threatened actions, Defendant's Counterclaim as filed still wildly alleges misappropriation of trade secrets without any supporting facts, and that it suffered damages from an employee's supposed breach of contract in how he carried out his duties day-to-day, despite the absence of factual predicate.

30

223. The vacuousness of Defendants' allegations against Dr. Samirah will be demonstrated through the evidence, and thereby further prove that the Counterclaims are unavailing, and in fact, are—together with the series of threats-- just further obvious retaliation.

## STATEMENT OF CLAIMS

### COUNT I:    BREACH OF CONTRACT
### AGAINST DEFENDANT DISTRICT SMILES

224. Dr. Samirah incorporates all the above paragraphs by reference.

225. "To prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Francis v. Rehman*, 110 A.3d 615, 620 (D.C. 2015); see also *Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 70 (D.D.C. 2005) ("Notwithstanding an at-will employment agreement, an employee and employer may still contract regarding other terms, such as bonuses or stock options.").

226. "However, to state a claim for breach of contract so as to survive a Rule 12(b)(6) motion to dismiss, it is enough for the plaintiff to describe the terms of the alleged contract and the nature of the defendant's breach." *Francis*, 110 A.3d at 620 (emphasis added).

227. In this case, Defendant entered into an employment contract with Plaintiff in which it agreed that it "shall" provide him with 48 hours' compensated clinical work per week.

228.    However, Defendant never actually provided that contractually required compensation level, instead pretending that the provision was not present in the contract and only paying Dr. Samirah a percentage of actual collections for whatever patients they were able to provide.

229.    Defendant District Smiles breached the contract again when it demanded that Dr. Samirah perform many hours of uncompensated work instead of the 48 clinical hours required by the contract, and when he resisted, insisting that such performance was a condition of employment, and when he continued to resist, firing him in retaliation.

230.    Through its actions, Defendant District Smiles caused significant damage to Dr. Samirah.

### COUNT II:   FAILURE TO PAY WAGES IN VIOLATION OF D.C. CODE ANN. § 32-1301 et seq, AGAINST DEFENDANTS DISTRICT SMILES, SEIFI, KIMMEL, AND POWELL

231.    Dr. Samirah incorporates all the above paragraphs by reference.

232.    D.C. Code § 32-1301(3) defines "wages" as

(A) Bonus;

(B) Commission;

(C) Fringe benefits paid in cash;

(D) Overtime premium; and

(E) Other remuneration promised or owed:

(i) Pursuant to a contract for employment, whether written or oral;

(ii) Pursuant to a contract between an employer and another person or entity; or

(iii) Pursuant to District or federal law.

233.    Under the District of Columbia Wage Payment and Collection Law ("DCWPCL") § 32-1301(3)(A), "wages" are defined to include all monetary compensation, regardless of how the amount owed is determined. *See Molock v. Whole Foods Mkt., Inc.*, 297 F. Supp. 3d 114, 134 (D.D.C. 2018).

234.    Under the DCWPCL, employees are entitled to promise hourly wages even if an employment agreement is merely oral. *See* D.C. Code Ann. § 32-1302; *Pleitez v. Carney*, 594 F. Supp. 2d 47, 48 (D.D.C. 2009); *Sanchez v. Magafan*, 892 A.2d 1130, 1134 (D.C. 2006).

235.    A Plaintiff must be able to identify the criteria for bonuses, whether there was any written document of the policy, who decided bonus amounts, or other important aspects of the policy. *See Dorsey v. Jacobson Holman*, PLLC, 756 F. Supp. 2d 30, 36 (D.D.C. 2010).

236.    The DCWPCL, D.C. Code § 32-1302, requires that employers pay *all* wages on regular paydays designated in advance by the employer, not just overtime or minimum wages.

237.    If an individual has the right to control and direct the work of an individual as to both results, details, or means and manner of achieving job performance, such individual is an "employer" within the meaning of D.C. Code § 32-1302.

238.    "The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Ruffin v. New Destination*, 800 F. Supp. 2d 262, 269 (D.D.C. 2011) (*citing Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983); *see also Wilson v. Hunam Inn, Inc.*, 126 F. Supp. 3d 1, 5 –6 (D.D.C. 2015) (same); Perez v. C.R. Calderon Constr., Inc., 221 F. Supp. 3d 115, 143 –44 (D.D.C. 2016) (Howell, J.).

239.    Furthermore, "the DCWPCL is construed consistently with the FLSA," rendering Defendants' failure to pay immediately actionable upon delay. *See Amaya v. Logo Enters., LLC*, 251 F. Supp. 3d 196, 198 n.1 (D.D.C. 2017) (quoting *Ventura v. Bebo Foods, Inc.*, 738 F. Supp. 2d 1, 6 (D.D.C. 2010)).

240.    Here, the individual Defendants, the owner and her close kin, who were also formally tasked with running District Smiles, had the right to control and direct the work of Dr. Samirah as to results, details, or means and manner of achieving job performance, such that these individuals were "employers" within the meaning of D.C. Code § 32-1302.

241.    By failing to pay the promised compensation according to the contract formula, Defendants failed to provide the promised employment remuneration and violated the statute.

242.    Plaintiff Samirah suffered compensable financial damages as a result of the violation.

**COUNT III:         DISCRIMINATORY PAY PRACTICES ON ACCOUNT OF RACE, SEX, AND RELIGION, IN VIOLATION OF THE DCHRA, AND RACE IN VIOLATION OF 42 U.S.C. § 1981, AGAINST DEFENDANTS DISTRICT SMILES, SEIFI, KIMMEL, AND POWELL**

243.    Dr. Samirah incorporates all the above paragraphs by reference.

244.    As set forth above, Defendants refused to live up to their contract bargain with Dr. Samirah, by refusing to pay him the mandatory 48 hours' weekly compensation and by requiring him to be available and on-premises without any compensation for additional time.

245.    However, after firing Dr. Samirah, Defendants offered his prior position to a replacement, Dr. Jassam.

246.    Dr. Jassam is a woman who, like Defendants Seifi and Kimmel, is an outwardly non-religious Muslim.

247.    Unlike Dr. Samirah, Dr. Jassam does not identify as Black or have a history of protesting unfair pay or prior discrimination by Defendants.

248.    Defendants offered to compensate Dr. Jassam, who—unlike Dr. Samirah—was straight out of dental school, with the very compensation terms that Dr. Samirah had sought from Defendants when they failed to satisfy the 48 clinical hour guarantee which they promised, thereby engaging in discriminatory disparate treatment.

249.    Plaintiff Samirah suffered compensable emotional and financial damages as a result of this disparate treatment.

**COUNT IV:**        **DISCRIMINATORY FIRING ON ACCOUNT OF RACE IN VIOLATION OF 42 U.S.C. § 1981, AND ON ACCOUNT OF RACE, SEX AND RELIGION, IN VIOLATION OF THE DCHRA AGAINST DEFENDANTS DISTRICT SMILES, SEIFI, KIMMEL AND POWELL**

250.    Dr. Samirah incorporates all the above paragraphs by reference.

251.    As shown in the facts, Defendants harbored and condoned discriminatory attitudes against Black people and religious Muslims and offered discriminatorily superior employment terms to a woman.

252.    Defendants fired Dr. Samirah and are attempting to justify it by concocting alleged performance deficiencies which are merely pretexts for discrimination and retaliation.

253.    For instance, Defendants alleged that he failed to inform them that he was running for political office, when in fact he did so inform them.

254.    The individual Defendants "acted in the interest of" and/or "aided and abetted" District Smiles in the termination, within the meaning of the Human Rights Act.

255.    The individuals participated in the adverse action and/or acted with discriminatory motive as required by 42 U.S.C. § 1981.

256.    Plaintiff Samirah suffered compensable emotional and financial damages as a result of the violation.

**COUNT V:   UNLAWFUL RETALIATORY FIRING IN VIOLATION OF 42 U.S.C. § 1981 AND THE DCHRA, AGAINST DEFENDANTS DISTRICT SMILES, SEIFI, AND KIMMEL**

257.    Dr. Samirah incorporates all the above paragraphs by reference.

258.    It is unlawful under the DCHRA and under The Civil Rights Act of 1866, 42 U.S.C. § 1981, for an employer to retaliate against an employee or other person for taking protected actions against it.

259.    Under the U.S. Supreme Court's ruling in *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53 (2006), a retaliatory action can form the basis of a claim if it would tend to deter employees or others from making a discrimination complaint.

260.    As discussed above, Dr. Samirah opposed Defendants' discrimination in April and May 2019, by calling out Powell's bigoted statements, complaining to Kimmel about racial discrimination, and complaining to Defendants Kimmel, Seifi and Powell about islamophobia—specifically being called a terrorist by Figueroa, and continuing to object to being called "Abraham" by Kimmel and Seifi.

261.    Shortly after he raised these dire concerns in a mid-May meeting at the District Smiles facility, Defendants requested that Dr. Samirah resign or purchase the practice, and when he would do neither, fired him.

262.    As Defendants' actions in response to Dr. Samirah's protests, in theory, could easily deter a reasonable employee from making a complaint, Defendants have violated the anti-retaliation provisions of the DCHRA.

263.    The individual Defendants "acted in the interest of" and/or "aided and abetted" District Smiles in the termination, within the meaning of the Human Rights Act.

264.    The individual Defendants participated in the adverse action and/or acted with retaliatory motive as required by 42 U.S.C. § 1981.

265.    Defendants have offered pretextual excuses to justify the firing.

266.    Defendants have thereby caused Samirah damages, both financial and emotional.

**COUNT VI:        UNLAWFUL RETALIATORY FIRING IN VIOLATION OF THE DCWPCL, D.C. CODE § 32-1311(a)(1), AGAINST DEFENDANTS DISTRICT SMILES, SEIFI, KIMMEL AND POWELL**

267.    Dr. Samirah incorporates all the above paragraphs by reference.

268.    D.C. Code § 32-1311(a)(1)  renders it unlawful for any employer to discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee or person because that employee or person has: "(1) Made or is believed to have made a complaint to his or her employer. . . or to any other person that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter or the Living Wage Act, or any regulation promulgated pursuant to this chapter or the Living Wage Act[.]"

269.    "One of the activities protected under the WPCL includes making a complaint to one's employer that the employer violated a provision of the law. D.C. Code § 32-1311(a)(1)." *Sivaraman v. Guizzetti & Associates*, No. 18-CV-1201 D.C. Court of Appeals (June 11, 2020).

270.    Here, as shown in the facts, Dr. Samirah protested Defendants' failure to pay him as promised to Defendant Powell on April 8, 2019.

271.    Upon information and belief, Powell conveyed the complaint to Defendants Kimmel (his stepdaughter) and Seifi (his wife) shortly thereafter.

272.    Dr. Samirah again protested his compensation to Defendant Kimmel by email on May 7.

273.    Dr. Samirah again protested his compensation to Defendants Kimmel, Seifi and Powell, in an in-person mid-May 2019 meeting at the District Smiles facility, specifically alleging that Defendants had him performing "uncompensated work[,]" had him "sitting around, waiting for something to do" (while being paid solely on commission).

274.    Pursuant to D.C. Code § 32-1311(b), it was not necessary for Dr. Samirah's "complaint[s] or other communication[s] [to] make explicit reference to any section or provision" of the statute to trigger its anti-retaliatory protections.

275.    Defendants terminated Dr. Samirah's employment because he, in good faith, demanded correction to the failure to provide his contractual compensation and the compensation which Defendants promised him, which is a protected act under the DCWPCL.

276.    The individual Defendants, the owner and her close kin who were also formally tasked with running District Smiles, had the right to control and direct the work of Dr. Samirah as to results, details, or means and manner of achieving job performance, such that these individuals were "employers" within the meaning of D.C. Code § 32-1302.

277.     Under D.C. Code § 32-1311(b), when the employer or any person acting on behalf of the employer takes adverse action against an employee within 90 days of an employee or other person's engagement in statutorily-protected activities, there is a legal presumption that such action is retaliation, which may be rebutted only by clear and convincing evidence that such action was taken for other permissible reasons.

278.     Defendants have offered pretextual excuses to justify the firing.

279.     By retaliatorily firing Dr. Samirah within less than three months after his protected activities of April 8, May 7 and mid-May 2019, Defendants caused him substantial financial damage, in violation of D.C. Code § 32-1311(b).

### COUNT VII: UNLAWFUL RETALIATORY THREATS AND COUNTERCLAIMS IN VIOLATION OF  42 U.S.C. § 1981, THE DCHRA, AND THE DCWPCL, D.C. CODE § 32-1311(a)(1), AGAINST DEFENDANTS DISTRICT SMILES, SEIFI, KIMMEL AND POWELL

280.     Dr. Samirah incorporates all the above paragraphs, which were included in his initial Complaint, by reference.

281.     Count VI of the initial Complaint alleged violation of D.C. Code § 32–1311, on "Retaliation", which states that:

**(a)**   It shall be unlawful for any employer to discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee or person because that employee or person has. . . **(2)** Initiated or is about to initiate a proceeding under or related to this chapter;

282.     Count V of the initial Complaint alleged violation of the D.C. Human Rights Act and 42 U.S.C. § 1981.

283.    Thus, it is unlawful under the DCHRA and under The Civil Rights Act of 1866, 42 U.S.C. § 1981, for an employer to retaliate against an employee or other person for taking protected actions against it.

284.    As discussed in reference to Count VI, under D.C. Code § 32-1311(b), when the employer or any person acting on behalf of the employer takes adverse action against an employee within 90 days of an employee or other person's engagement in statutorily-protected activities, there is a legal presumption that such action is retaliation, which may be rebutted only by clear and convincing evidence that such action was taken for other permissible reasons.

285.    Such presumption applies to Defendants' counterclaims here.

286.    Under the U.S. Supreme Court's ruling in *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53 (2006), a retaliatory action can form the basis of a claim if it would tend to deter employees or others from making a discrimination complaint.

287.    Defendants issued various threats against Dr. Samirah within 90-days after his protected activities.

288.    Additionally, Defendants have filed two counterclaims, alleging breach of contract and violation of the D.C. Uniform Trade Secrets Act.  See Docket No. 34.

289.    "[A] lawsuit … may be used by an employer as a powerful instrument of coercion or retaliation" and may dissuade individuals from

pursuing their claims." *Rosania v. Taco Bell of Am., Inc.*, 303 F. Supp. 878, 885 (N.D. Ohio 2004) (internal quotations omitted).

290.    Legal proceedings – including counterclaims – can constitute actionable retaliation if they are filed against an employee in response to the employee asserting statutory workplace rights. See, e.g., *Jacques v. DiMarzio, Inc.*, 216 F. Supp. 2d 139, 141-43 (E.D.N.Y. 2002) (defendant's counterclaims found sua sponte to be retaliatory, dismissal and sanctions issued sua sponte); *Gliatta v. Tectum, Inc.*, 211 F. Supp. 2d 992, 1008-1009  (S.D. Ohio 2002) (the adverse action requirement for a retaliation claim encompasses an allegedly bad faith counterclaim brought by the employer against its former employee) ) (citing *EEOC v. Outback Steakhouse of Florida, Inc.*, 75 F. Supp. 2d 756 (N.D. Ohio 1999) (same)); *Cozzi v. Pepsi-Cola Gen.Bottlers, Inc.*, No. 96 C 7228, 1997 WL 312048, at *3 (N.D. Ill. 1997) (state court fraud lawsuit alleged to be retaliatory).

291.    A retaliation claim can be added as part of a plaintiff's reply to the counterclaim. See Fed. R. Civ. P. 7(a) (Reply).

292.    It can also be added pursuant to the provisions of Fed. R. Civ. P. 15(a); *United Magazine Co. v. Murdoch Magazines Distribution, Inc.*, 2003 WL 223462 (S.D.N.Y. 2003) (allowing for inclusion of additional claim in reply under F.R.C.P. 15(a)'s liberal amendment standard).

293.    In this case, Defendants have previously demonstrated a threatening, vindictive, retaliatory approach to Dr. Samirah leading to its unlawful firing of him as alleged in the initial complaint.

294.     Dr. Samirah's lawsuit is protected activity which is causally connected to Defendants' filing of its counterclaims, by virtue of Defendants' ongoing animus against Dr. Samirah, threats issued to him amid demands that he pay Defendants and drop the case, the timing of the Defendants' actions against alleged actions of Dr. Samirah, and the absence of an explanation or motive alternative to retaliatory animus.

295.     Defendants' breach of contract contention will be shown to be meritless, and to have been interposed for the improper and vexatious purpose of deterring Dr. Samirah in pursuing his statutory employment claims. See *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006).

296.     Defendants further allege a violation of the D.C. Uniform Trade Secrets Act, D.C. Code §§ 36-401 - 36-410 (2011).

297.     Notably, while alleging a violation, Defendants fail even to attempt to provide any specific facts supporting its conclusory allegations.

298.     Defendants' D.C. Uniform Trade Secrets Act contentions will be shown to be meritless.

299.     There is no available factual explanation but that Defendants' claim under the D.C. Uniform Trade Secrets Act, in keeping with its earlier threats, is interposed for the improper and vexatious purpose of deterring Dr. Samirah in pursuing his statutory employment claims. *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006).

300.     Defendants threatened still more legal action against Dr. Samirah though they have not followed through, including seeking injunctive relief and a claim for intentional infliction of emotional distress; these also were clearly threatened within the 90-day period to discourage him from pursuing his statutory employment claims.

301.     As noted, Defendants threatened to "feature centrally" an irrelevant but potentially embarrassing video in further attempt to deter Dr. Samirah from following through on his case.

302.     This threat, also communicated during the 90-day period, violates the statutes as unlawful retaliation.

303.     Defendants have caused—and Dr. Samirah will prove-- further compensable emotional damages and financial costs as a result of their retaliatory threats and counterclaims.

## REQUEST FOR RELIEF

**WHEREFORE, the Plaintiff, Dr. Samirah, prays that the Court grant him the following relief:**

(a)     Full back pay, lost income, and benefits.

(b)     "Mandatory liquidated damages equaling three times the amount of unpaid wages." See D.C. Code § 32-1308(a)(1)(A)(ii); [1]

---

[1] *Sivaraman v. Guizzetti & Associates*, No. 18-CV-1201 *Herrera v. Mitch O'Hara LLC*, 257 F. Supp. 3d 37, 2017 WL 2869410, at *5 (D.D.C. 2017) (citing D.C. Code § 32-1308(a)(1)(A)(ii)).

(c)    Lost compensation, civil penalty, and liquidated damages pursuant to D.C. Code § 32-1311(b);

(d)    Compensatory damages under the DCHRA and 42 U.S.C. § 1981, in an amount to be determined by the jury in accordance with the proof at trial, for the emotional and consequential harms caused by Defendants.  *Seeruz v. Ruby Constr. Assocs., LLC*, No. 1:17-cv-00349 (LO/IDD), 2017 U.S. Dist. LEXIS 219276, at *12 (E.D. Va. Dec. 8, 2017);

(e)    Any relief available pursuant to D.C. Code §32-1311(c).

(f)    Punitive damages;

(g)    Prejudgment and post judgment interest;

(h)    Reasonable attorneys' fees, expenses and costs;

(i)    Posting of notices on Defendants' premises notifying employees that Defendants have violated the anti-discrimination laws and that employees who report future violations may not be subject to retaliation;

(j)    Injunctive relief, including but not limited to: an order reinstating Dr. Samirah to employment and such other equitable relief as necessary to effectuate the statutes' purposes; and

(k)    Such other relief as the court shall deem just and proper.


## JURY TRIAL DEMAND

The Plaintiff demands that this case be tried by a jury.


45

Respectfully submitted,

THE GOLDSMITH LAW FIRM, LLC

/S/    Leizer Z. Goldsmith

_____

Leizer Z. Goldsmith (D.C. Bar 419544)
5335 Wisconsin Avenue, NW, Suite 440
Washington, D.C. 20015
Telephone: (202) 926-3535
Email: lgoldsmith@goldsmithfirm.com
Attorney for Plaintiff Dr. Ibraheem
Samirah