# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| IBRAHEEM SAMIRAH, DDS, | * | |
| | * | |
| Plaintiff | * | |
| | * | Civ. No.: MJM-21-829 |
| v. | * | |
| | * | |
| DISTRICT SMILES, PLLC, et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

This matter is before the Court on cross-motions for summary judgment by District Smiles PLLC, Maryam Seifi, William Powell, and Nina Kimmel (collectively, "Defendants") and Dr. Ibraheem Samirah ("Samirah" or "Plaintiff"). Both motions are fully briefed and ripe for disposition. No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2023). For the reasons set forth below, the Court shall grant in part and deny in part Defendant's Motion for Summary Judgment (ECF 92) and deny Plaintiff's Partial Motion for Summary Judgment (ECF 102).

## I.    FACTUAL BACKGROUND

Plaintiff Dr. Ibraheem Samirah is a dentist and a Muslim, Arab-presenting male. Def. Ex. EEE (Samirah Dep.), ECF 92-17, at 81:1, 99:3. Samirah identifies as Afro-Arab, although, according to his deposition testimony, he does not "visibly present as black." Samirah Dep. at 99:7-8.

From approximately July 2018 to June 2019, Samirah had an employment relationship with Dr. Maryam Seifi, another dentist, at two dental offices owned by Seifi: StarBrite Dental in Bethesda, Maryland ("StarBrite"); and District Smiles, PLLC in Washington D.C. ("DS"). Samirah Dep. at 14:4, 15:5-11. Seifi was born and raised Muslim in Iran and is a native speaker of Farsi. Am. Compl. (ECF 44) ¶ 6; MSJ ¶ 58. Seifi's husband, William Powell, is the Office Manager of DS and a non-Muslim black man. Am. Compl. ¶ 8; MSJ ¶ 6, 58. Nina Kimmel is Seifi's daughter and assists Seifi in an administrative capacity. Am. Compl. ¶ 7, MSJ ¶ 7. Samirah was employed at StarBrite in a salaried capacity from around July 2018 through September 2018. Am. Compl. ¶ 5; MSJ ¶ 8. In early October 2018, Samirah was offered a commission-based contract by Seifi to work at DS. Def. Ex. C (texts), ECF 92-9.

**A. Employment Contract**

On October 16, 2018, after a period of negotiations, Samirah and Seifi, on behalf of DS, executed the employment contract. Def. Ex. W, ECF 92-50.

The relevant portion of the Policies and Procedures provision of the contract (§ 2.2) states:

> District Smiles reserves the right to review the determinations and decisions of Dr. Samirah in connection with the rendering of his professional services to determine whether recognized professional standards and ethics are being complied with by Dr. Samirah.

*Id.*

The relevant portion of the Working Hours provision of the contract (§ 2.4) states:

> District Smiles reserves the right to prescribe the working hours for Dr. Samirah, including any specific coverage hours on an ongoing basis. District Smiles shall offer Dr. Samirah no less than forty-eight (48) hours of clinical working hours each week and shall inform him of any changes to this working schedule with fifteen (15) prior days' notice. Dr. Samirah understands, however, that a dental assistant may not be available for the entirety of those hours each week.

*Id.*

The contract provides that Dr. Samirah shall be paid a salary and a percentage of DS's net collections. The Collections provision (§ 3.1) states:

> Dr. Samirah shall be compensated at a rate of thirty percent (30%) of the net collections of District Smiles less fifty percent (50%) of the laboratory fees associated with District Smiles patients. For purposes of this section, net collections shall mean the total net collections after any merchant fees, discounts and refunds. District Smiles reserves the right to change the compensation structure by providing Dr. Samirah with thirty (30) days prior written notice of such change.

*Id.*

The relevant portion of the Outside Professional Activities provision of the contract (§ 7) states:

> Dr. Samirah may perform … other activities (other than the practice of dentistry) as may be approved in writing, in advance, by the District Smiles.

The relevant portion of the Termination With Cause provision (§ 8.4.7.) states:

> District Smiles shall have the right to terminate Dr. Samirah's employment immediately in the event of any of the following circumstances: … Dr. Samirah's inability to work with and relate to others, including to but not limited to, District Smiles' patients and ancillary staff, in a respectful cooperative and professional manner.

*Id.*

### B. Discrimination Allegations

Samirah alleges that while working at StarBrite, he experienced a discriminatory work environment based on race, gender, and religion. Specifically, Samirah alleges that he was called the "N word" by his co-worker, Dr. Omar Akmal, who is Pakistani. Samirah Dep. at 111:17, 112:5. In or around July 2018, Samirah alleges that he was discriminated against for having a long beard, which reflected his Muslim identity. *Id*. at 90:20, 95:10. Samirah testified that, around this time, due to his appearance, he was subjected to being called a "terrorist" by Celine Figueroa, one of his

colleagues, although he "c[ouldn't] remember" the substance of the conversation during his deposition. *Id*. at 85:4-7. Additionally, Samirah testified that, while employed at DS, he had numerous political conversations with Powell, who stated that he was a "Trump supporter" and that he thought black people were "lazy". *Id*. at 178:14–16. Samirah also alleges that he was asked to read a book about Scientology and that he "definitely fe[lt] like" being asked to read the book was an attempt to convert him into the religion. *Id*. at 228:6. Samirah's only allegation of discrimination at DS concerned his conversation with Powell. Def. Ex B (Samirah Resp. to Requests for Admissions), ECF 92-6, No. 3.

### C. Conduct Prior to Termination

Defendants present evidence of Samirah's conduct that resulted in his termination, which included Samirah failing to notify Defendants he was running for state elective office while employed at DS, failing to take intra-oral photos of patients during examinations, and sleeping in the office.

1.  <u>Samirah's failure to Notify DS that he was running for office and campaign-related work in the DS office.</u>

While employed at DS, Samirah ran for a seat on the Virginia House of Delegates and was elected on February 20, 2019. Samirah Dep. at 17:18, 212:6. Samirah created a Twitter account and began running for office around October 9, 2018. Def. Ex. AA, ECF 92-4, at 8. According to Samirah, he was "very politically active" in November 2018, and he did not notify DS that he was running for office until around December 2018. Samirah Dep. at 213:1-2, 213:19. Samirah admits that he performed campaign work while he was in the DS office. Samirah Dep. at 214:16.

2.  <u>Samirah's failure to take intra-oral photos of patients.</u>

Pursuant to Section 2.2 of the employment contract, DS sent Samirah an email on April 11, 2019, stating the need for him to take intra-oral photographs on every patient at DS and on

every tooth before conducting any procedure and, for restorative procedures, the need for photos before, during, and after the completion the procedure. Def. Ex. U, ECF 92-46. Plaintiff failed to take intra-oral photos more than 20 times from October 2018 to May 2019, and failed to take intra-oral photos at least four times after being notified on April 11. *Id*. Seifi testified that she had a conversation with Samirah about him not taking the intra-oral photos "because he would forget." Seifi Dep., ECF 102-2, at 128:17. Kimmel testified that Samirah's failure to take intra-oral photos was a "heated topic" in the office, and that Seifi "kept saying" that she "need[ed]" Samirah to take the photos. Def. Ex. CCC (Kimmel Dep.), ECF 92-11, at 156:15-157:7.

3. Samirah sleeping in the office.

Samirah kept a pillow and blanket in his DS office, and he admits to sleeping in the office when he did not have any patients. Video 1, 3/28/2019; Samirah Dep. at 282:20-284:10. On or about January 17, 2019, Samirah fell asleep in the DS waiting room during an office-wide StarBrite seminar with all his colleagues present. Def. Ex. BB, ECF 92-7; Def. Ex. CC, ECF 92-10.

**D. Termination of Samirah's Employment**

Samirah had disputes with Defendants over his compensation, although he admits that "Defendants paid him for those of his hours for which they did provide patients, in accordance with the agreed-upon rate." Def. Ex. B, No. 7. On April 7 or 8, 2019, Samirah made a complaint to Powell protesting Defendants' failure to pay him his promised compensation. Def. Ex. A (Samirah Interrogatory Resp.), ECF 92-3, No. 25; Samirah Dep. at 188:21-188:2. On May 7, 2019, Samirah sent an email to Kimmel, protesting his pay. Samirah Dep. at 187:18-20; Samirah Interrogatory Resp. No. 25.

As a result of the disputes over compensation and working hours, the parties scheduled a meeting on May 20, 2019. Def. Ex. AAA (Kimmel Decl.), ECF 92-5, at ¶ 2; Samirah Dep. at

248:1, 251:11-21. During the meeting, after citing a botched root canal, lack of intra-oral photos, and the compensation dispute, Defendants gave Samirah an ultimatum to either resign or purchase the DS practice. Kimmel Decl. at 6; Samirah Dep. at 254:1-12. During this meeting, Samirah again protested his compensation to Kimmel, Seifi and Powell, alleging that Defendants had him performing "uncompensated work" and had him "sitting around, waiting for something do." Samirah Interrogatory Resp. No. 25.

On May 27, 2019, Plaintiff sent another email citing "the massive degree of reduction" of his pay and arguing that he was wrongfully being denied pay. Def. Ex. N, ECF 92-34, at 4; Samirah Interrogatory Resp. No. 25; Samirah Dep. at 188:7. In a reply to that email on the same day, Kimmel responded that Samirah was in breach of his contract and needed to resign. Interrogatory No. 25.

On May 28, 2019, Defendants' attorney sent Samirah an email telling him to either resign or purchase the practice. Def. Ex. O (ECF 92-35) at 3; Samirah Interrogatory Resp. No. 12.

On June 17, 2019, Samirah became upset about a scheduling issue. Kimmel Dep. at 227:8–13; Seifi Dep. at 30:1–9. He then locked himself in a room and began writing down and copying patient information from a computer, while on surveillance camera. Kimmel Dep. at 227:8–229:20; Seifi Dep. at 30:1–9. Kimmel sent messages to Samirah asking him to stop, but he refused, forcing Kimmel to direct IT to shut the computer down. Kimmel Dep. at 227:8–229:20; Seifi Dep. at 30:1–9. Samirah's behavior prompted Defendants to terminate Samirah's employment. Kimmel Dep. at 227:8–13; Seifi Dep. at 30:1–9.

On June 18, 2019, Defendants' attorney sent Samirah an email notifying him that, pursuant to section 8.4 of the employment agreement, he was being terminated for cause effective June 17, 2019. Def. Ex. O at 2.

## II.     PROCEDURAL HISTORY

On June 16, 2020, Samirah filed a complaint in the District of Columbia Superior Court against DS, Dr. Maryam Seifi, William Powell, and Nina Kimmel (collectively, "Defendants"). ECF 1-1. The original Complaint asserted claims in six counts: (I) breach of contract, against DS; (II) failure to pay wages, in violation of D.C. Code Ann. § 32-1301, against DS, Seifi, Kimmel and Powell; (III) discriminatory pay practices based on race, sex, and religion under 42 U.S.C. § 1981 and DCHRA, against DS, Seifi, Kimmel, and Powell; (IV) discriminatory firing based on race in violation of 42 U.S.C. § 1981 and DCHRA, against DS, Seifi, Kimmel, and Powell; (V) retaliatory firing in violation of 42 U.S.C. § 1981 and DCHRA, against DS, Seifi, and Kimmel; and (VI) retaliatory firing in violation of DCWPCL, D.C. Code § 32-1311(a)(1), against DS, Seifi, Kimmel, and Powell.

On or about October 26, 2020, Defendants filed a Notice of Removal in the United States District Court for the District of Columbia, asserting federal question jurisdiction under 28 U.S.C. § 1331. ECF 1. On November 2, 2020, Defendants filed a Motion to Dismiss the Complaint in part for failure to state a claim, as well as a Motion to Transfer Venue to the United States District Court for the District of Maryland. ECF 5. On March 10, 2021, Judge Mehta granted Defendants' Motion to Transfer the case but declined to reach the merits of the Motion to Dismiss. ECF 12. On March 31, 2022, Judge Chuang conducted a hearing on Defendants' Motion to Dismiss and denied the motion. ECF 33.

On June 30, 2022, Defendants filed an answer to the Complaint, and DS asserted counterclaims for breach of contract and misappropriation of trade secrets. ECF 34. On August 7, 2022, Samirah filed an answer to DS's counterclaims. ECF 40. On August 19, 2022, Samirah filed an Amended Complaint, which added a claim in Count VII for retaliatory counterclaims, in

violation of 42 U.S.C. § 1981, DCHRA, DCWPCL, and D.C. Code § 32-1311(a)(1), against DS, Seifi, Kimmel, and Powell. ECF 44. On October 14, 2022, Defendants filed a Partial Motion to Dismiss Count VII. ECF 51. On June 9, 2023, Judge Chuang denied Defendants' Motion to Dismiss Count VII. ECF 61. On June 29, 2023, Defendants filed an answer to Samirah's Amended Complaint and counterclaims for breach of contract and misappropriation of trade secrets under District of Columbia law. ECF 62.

On November 14, 2023, the case was reassigned to the undersigned district judge. On April 5, 2024, after discovery, Defendants filed a Motion for Summary Judgment on all of Samirah's claims. ECF 92. On June 24, 2024, Samirah filed a response in opposition to Defendants' Motion for Summary Judgment, as well as a Motion for Partial Summary Judgment. ECF 102. Specifically, Samirah seeks summary judgment on Counts VI and VII of the Amended Complaint. *Id.* On August 1, 2024, Defendants filed a reply in support of their motion and opposition to Samirah's motion. ECF 106. On October 10, 2024, Samirah filed a reply in support of his motion. ECF 109.

## III.   STANDARD OF REVIEW

A court may grant a party's summary judgment motion under Rule 56 if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020). A fact is "material" if it "might affect the outcome of the suit under the governing law[,]" and a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986) (emphasis removed); *see also Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016). A party can establish the absence or presence of a

genuinely disputed fact through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The court must view all the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmovant, *Matsushita Elec. Indus.*, 475 U.S. at 587, but the court is not permitted to weigh the evidence, make credibility determinations, or decide the truth of disputed facts. *Anderson*, 477 U.S. at 249.

"The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact." *Med. Mut. Ins. Co. of N. Carolina v. Gnik*, 93 F.4th 192, 200 (4th Cir. 2024) (citing *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003)). The burden then shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." *Bouchat*, 346 F.3d at 522 (quoting Fed. R. Civ. P. 56(e)).

When both parties file motions for summary judgment, "the role of the court is to 'rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F. Supp. 720, 729 (D. Md. 1996) (quoting *Towne Mgmt. Corp. v. Hartford Acc. And Indem. Co.*, 627 F. Supp. 170, 172 (D. Md. 1985)). "Cross-motions for summary judgment do not automatically empower the court to dispense with the determination of whether questions of material fact exist." *Id.* (quoting *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voight*, 700 F.2d 341, 349 (7th Cir.), *cert. denied*, 464 U.S. 805 (1983)). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

## IV.    DISCUSSION

### A.  Count II: DCWPCL

In Count II of the Amended Complaint, Samirah asserts a claim that Defendants failed to pay him wages he earned, in violation of the District of Columbia Wage Payment and Collection Law ("DCWPCL"). Defendants seek summary judgment on this count.

The DCWPCL requires that an employer "pay all wages earned to his or her employees on regular paydays designated in advance by the employer and at least twice during each calendar month." D.C. Code § 32–1302. The statute defines "wages" as "all monetary compensation after lawful deductions, owed by an employer, whether the amount owed is determined on a time, task, piece, commission, or other basis of calculation." *Id.* § 32–1301(3). To establish a violation under the DCWPCL, a plaintiff must show that they were entitled to wages that were not paid to them. *See, e.g.*, *Ayala v. Tito Contractors, Inc.*, 82 F. Supp. 3d 279, 286 (D.D.C. 2015); *Alvarez-Soto v. B. Frank Joy, LLC*, 258 F. Supp. 3d 615, 625 (D. Md. 2017).

Samirah's DCWPCL claim fails because he offers no evidence that Defendants failed to pay him wages he earned working. To the contrary, Samirah admits that he was paid for hours he worked providing services to patients. Specifically, in response to a request for admission, Samirah states that he "admits that Defendants paid him for those of his hours for which they did provide patients, in accordance with the agreed-upon rate." Def. Ex. B (ECF 92-6) at 2; *see also* Samirah Paystubs - Def. Ex. P (ECF 92-37). Samirah's only dispute regarding his compensation is his claim that Defendants failed to offer him at least 48 clinical working hours per week, which he contends was required under Section 2.4 of his employment contract with DS. Def. Ex. W at 3. While this fact, if true, may support DS's liability for breach of contract, it does not support a claim for unpaid wages under the DCWPCL.

Accordingly, summary judgment shall be granted for Defendants on Count II.

**B.  Counts III and IV: Discriminatory Pay and Termination**

In Counts III and IV, Dr. Samirah claims that Defendants discriminated against him based on his race, sex, and religion in violation of the D.C. Human Rights Act ("DCHRA") and 42 U.S.C. § 1981 when they terminated his employment and offered his position to Dr. Jassam, a non-religious Muslim woman who does not identify as black. Count III alleges discriminatory pay practices based on Defendants offering to compensate Dr. Jassam under the same terms they failed to satisfy with Dr. Samirah. Count IV alleges discriminatory termination of employment. Defendants seek summary judgment on both counts.

The DCHRA makes it an "unlawful discriminatory practice" for an employer "to discharge" or "otherwise to discriminate against any individual, with respect to his or her compensation, terms, conditions, or privileges of employment" on the basis of race, religion, or sex, among other categories. D.C. Code Ann. § 2-1402.11(a)(1)(A). Courts frequently look to case law interpreting federal anti-discrimination statutes like the Equal Pay Act of 1963 and Title VII of the Civil Rights Act of 1964, for guidance when interpreting the DCHRA. *See Hawley v. Blackboard, Inc.*, Civ. No. 03-656 (GK), 2005 WL 513496, at *8 n.1 (D.D.C. Mar. 3, 2005) ("Claims of unequal pay under the DCHRA are governed by the standards of the Equal Pay Act.") (citing *Howard Univ. v. Best*, 484 A.2d 958, 984 (D.C. 1984)); *D.C. v. Bryant*, 307 A.3d 443, 456 (D.C. 2024) (D.C. Court of Appeals "often look[s] to Title VII case law for guidance" when interpreting DCHRA, as appropriate).

Like discrimination claims brought under federal civil rights statutes, "DCHRA discrimination claims are assessed pursuant to the three-step framework set forth in *McDonnell Douglas Corp. v. Green*." *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 576 (D.C. Cir. 2010)

(citing *McDonnell Douglas*, 411 U.S. 792, 802–03 (1973)). To establish a claim of pay discrimination based on sex, a plaintiff "must make an initial (i.e., prima facie) showing of three elements: (1) the [employer] paid higher wages to an employee of the opposite sex who (2) performed equal work on jobs requiring equal skill, effort, and responsibility (3) under similar working conditions." *Spencer v. Virginia State Univ.*, 919 F.3d 199, 203 (4th Cir. 2019), *as amended* (Mar. 26, 2019) (citing *EEOC v. Maryland Ins. Admin.*, 879 F.3d 114, 120 (4th Cir. 2018)); *see also Hawley*, 2005 WL 513496 at *8 n.1 (citing *Howard Univ.*, 484 A.2d at 984) (unequal pay claims under DCHRA assessed under Equal Pay Act standards). "To establish a prima facie case of discriminatory discharge under the DCHRA, a plaintiff must show that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position that was the subject of the termination; (3) the plaintiff was terminated despite being qualified for the position; and (4) a substantial factor for the termination was that the plaintiff is a member of the protected class." *Lerch v. WCS Constr., LLC*, Civ. No. TDC-18-4014, 2020 WL 5747186, at *9 (D. Md. Sept. 25, 2020) (citing *Wallace v. Eckert, Seamans, Cherin & Mellott, LLC*, 57 A.3d 943, 955–56 (D.C. 2012), and *Siddique v. Macy's*, 923 F. Supp. 2d 97, 103 (D.D.C. 2013))

Section 1981 provides in part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). These rights "are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c). "Although the statute does not mention 'race,' the Supreme Court has interpreted it 'to forbid all racial discrimination in the making of private as well as public contracts[,]'" *Ali v. BC Architects Eng'rs, PLC*, 832 F. App'x 167, 170 (4th Cir. 2020), *as amended* (Oct. 16, 2020)

(quoting *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987)), including "discrimination in private employment on the basis of race[,]" *id.* (quoting *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 460 (1975)). "A plaintiff may ultimately prove a race-discrimination claim under § 1981 through 'direct or circumstantial evidence showing that an adverse employment action was [caused] by intentional discrimination aimed at the plaintiff's [race],' or through the 'burden-shifting framework' of *McDonnell Douglas Corp. v. Green* . . . ." *Id.* at 171 (quoting *Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)).   Under the *McDonnell Douglas* framework, "in order to establish a prima facie case of racial discrimination in compensation under . . . section 1981, [a plaintiff must] show: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action with respect to compensation; and (4) that similarly-situated employees outside the protected class received more favorable treatment." *White v. BFI Waste Servs., LLC,* 375 F.3d 288, 295 (4th Cir. 2004).

Once a plaintiff makes a prima facie case of discrimination under the *McDonnell Douglas* framework, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory justification for its allegedly discriminatory action. *Guessous*, 828 F.3d at 217. If the employer carries this burden, the plaintiff then must prove by a preponderance of the evidence that the neutral reasons offered by the employer "were not its true reasons, but were a pretext for discrimination." *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Samirah's discrimination claims in Count III fail because he offers no evidence that Defendants paid higher wages to Dr. Jassam and that disputes Defendant's evidence of his unsatisfactory job performance. Although Dr. Jassam is alleged to be a person of the opposite sex and of a different race than Samirah, there is no evidence that Defendants ever hired Dr. Jassam or that they paid or offered her greater compensation than that provided in Samirah's employment

contract. Because Samirah cannot show that any similarly situated employee outside of Samirah's sex or race received more favorable treatment, his discrimination claims must fail.

Furthermore, as to Count IV, the record evidence establishes that Samirah's job performance was not satisfactory in the eyes of his employer. "[T]o create a triable issue of fact as to satisfactory job performance, a plaintiff must demonstrate that he 'was performing [his] job duties at a level that met [his] employer's legitimate expectations at the time of the adverse employment action.'" *Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 704 (4th Cir. 2023) (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004)). "It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996) (citing *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980)) (cleaned up).

The parties met on May 19, 2019, to discuss and resolve their issues, and Plaintiff's employment was later terminated effective June 17, 2019. Kimmel Dep., ECF 92-11, at 185:9; Def. Ex. O at 2. On the date of his termination, Samirah became upset about scheduling issues. Kimmel Dep. at 227:8–13. He then locked himself in a room and began copying patient information, all while being observed on camera by Kimmel. *Id*. This incident prompted Defendants to terminate his employment. In Plaintiff's termination letter, Defendants list the following additional reasons for his termination:

> Over the last several months the practice has been made aware of several actions and inactions that violate the terms and conditions of your employment agreement. These include, but are not limited to, following the policies, rules and procedures of the practice with respect to taking intra-oral photos (Section 2.2 – District Smiles Policies and Procedures); not showing up thirty (30) minutes prior to the first scheduled patient (Section 2.4 -Working Hours); not providing at least (30) days advanced notice of scheduled leave (Section 5 – Leave); and failing to disclose for prior approval the running for elected office in the commonwealth of Virginia (Section

7 – Outside Professional Activities). The Practice is also concerned about using Practice property to perform outside professional activities and a potentially repeating pattern of tooth perforation with your patients.

Ex. O.

Samirah argues that all of Defendants stated reasons for firing him were pretextual. Pl. Opp. at 42-51. None of the reasons listed in the termination letter reflect any discriminatory animus or motivation, and each is a legitimate and supported by record evidence.

1.    Copying patient information

Deposition testimony establishes that, on the date of Samirah's termination, he became upset that another dentist "was being scheduled to work for the days that he wasn't going to be at work." Kimmel Dep. at 227:8–13; *see also* Seifi Dep. at 30:1–9 ("[Samirah] got upset for having another dentist see patients."). Samirah then "locked himself in the consult room and was writing down, copying patient information . . . ." Kimmel Dep. at 227:8–229:20; *see also* Seifi Dep. at 30:1–9 (Samirah "locked the door" and was observed "on the camera . . . taking pictures"). Samirah "had a patient in the chair" at the time. Kimmel Dep. at 227:8–229:20. Kimmel asked Samirah to stop, but he refused, forcing Kimmel to "have IT bring the whole server down." *Id.*; *see also* Seifi Dep. at 30:1–9 ("no matter what we did to beg him to stop and not continue, and he acted as he was just enjoying doing that"). Samirah's behavior prompted Defendants to terminate his employment. Kimmel Dep. at 227:8–13; Seifi Dep. at 30:1–9; Video 5.

2.    Tardiness

Regarding Samirah's tardiness, Defendants sent text messages to him on January 15, 2019, when he was 45 minutes late to a patient appointment; on March 17, 2019, when he failed to show up 30 minutes before the patient's appointment, as required by the employment agreement; and on April 15, 2019, when he failed to show up for a staff meeting on time. Def. Ex. GG, ECF 92-22,

at 4, 7, 10–12. On January 22, 2019, Kimmel texted Samirah requesting to get his location, even suggesting to him times that he should leave his house depending on the timing of his first patient appointment in order to make it to the DS office in time. Ex. ZZ, ECF 92-54, at 3-5.

### 3. Failure to take intra-oral photos

Regarding Samirah's failure to take intra-oral photos, Defendants present 24 separate instances where Samirah failed to comply with professional standards by not taking a complete set of photos or failing to take any photos at all during patient procedures. Ex. U. On April 11, 2019, Kimmel sent Samirah an email requesting that phots be taken, yet Samirah still failed to do so at least four more times after being notified. *Id*.

### 4. Sleeping

Samirah was caught sleeping on the job on multiple occasions. Video 1; Samirah Dep. at 282:20-284:10; Ex. BB; Ex. CC. Samirah kept a blanket and pillow in his office to sleep. Video 1. Samirah fell asleep in the DS waiting room during an office-wide seminar with all his colleagues present. Ex. CC. On or about January 17, 2019, Kimmel texted Samirah a screenshot of the office cameras showing him sleeping in the waiting room, and Samirah replied "Sorry I slumped on the chair. Should've went to the office." Ex. BB.

### 5. General unprofessional conduct

Finally, Samirah's generally unprofessional conduct included making unprofessional comments to and around patients. Ex. GG. For example, on November 8, 2018, Kimmel sent a text message to Samirah asking him if he told a patient, "don't worry, I get paid by the hour," while asking the dental assistant to check on his schedule while the patient was sitting in the chair for treatment. Ex. GG at 2. Kimmel received no response. *Id*. On April 8, 2019, Samirah "blew up" at Powell after Powell corrected him about taking out his phone during a patient presentation. *Id*. at

10. In response to the correction, Samirah told Powell that he "didn't give a shit about the patient and that she was wasting his time with imagined symptoms." *Id*.

      6. <u>Pretext</u>

Samirah presents no genuine dispute that Defendants had legitimate and non-pretextual reasons to terminate his employment. In an effort to establish that the foregoing reasons proffered for his termination were pretexts for discrimination, Samirah presents an excerpt from Seifi's deposition in which she answered "no" in response to being asked if Samirah was fired for tardiness and failing to take intra-oral photos. Pl. Ex. 2 (Seifi Dep.), ECF 102-2, at 128:10-130:1. However, Seifi's testimony is clear, and consistent with Kimmel's testimony, that what prompted the initial decision to terminate Samirah was the episode in which he began copying patient information in a locked room and refused to stop, all while he had a patient waiting. Kimmel Dep. at 227:8–13; *see also* Seifi Dep. at 30:1–9. Samirah's unprofessional—and potentially unlawful—behavior in this instance was a patently legitimate reason for termination, and Samirah offers no evidence that it was pretextual. Accordingly, summary judgment shall be granted in Defendants' favor on Counts III and IV.

**C.  Counts V and VI: Retaliatory Termination**

In Counts V and VI, Dr. Samirah claims that Defendants terminated his employment in retaliation for engaging in activities protected by DCHRA, 42 U.S.C. § 1981, and the DCWPCL. Defendants seek summary judgment in their favor on both counts, and Dr. Samirah seeks summary judgment in his favor on his claim of retaliation under the DCWPCL in Count VI.

The DCHRA and 42 U.S.C. § 1981 each support a cause of action for workplace retaliation for activities protected by these statutes, including complaints about workplace discrimination. *See Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010) (citing anti-retaliation provision of

DCHRA, D.C. Code § 2-1402.61); *Guessous*, 828 F.3d at 216–17 (4th Cir. 2016) (recognizing § 1981 retaliation claim). The DCWPCL also contains an anti-retaliation provision, which prohibits employers from "discharg[ing], threaten[ing], penaliz[ing], or in any other manner discriminat[ing] or retaliat[ing] against any employee . . . because that employee . . . has . . . [m]ade or is believed to have made a complaint to his or her employer . . . that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision" of the DCWPCL. D.C. Code Ann. § 32-1311(a)(1). Complaints of not being compensated as required by the DCWPCL constitutes a protected activity for which retaliation is prohibited. *Sivaraman v. Guizzetti & Assocs., Ltd.*, 228 A.3d 1066, 1078 n.18 (D.C. 2020).

To establish a prima facie case of retaliation in employment, a plaintiff must show ""(i) that [he] engaged in protected activity, (ii) that [her employer] took adverse action against [him], and (iii) that a causal relationship existed between the protected activity and the adverse employment activity." *Guessous*, 828 F.3d at 217 (quoting *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015)) (addressing employment retaliation under 42 U.S.C. § 1981); *see also Gaujacq*, 601 F.3d at 577 (identifying same elements for prima facie case of retaliation under DCHRA). Termination of employment is clearly an adverse action. *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 328 (4th Cir. 2018). Once the plaintiff presents a prima facie case of retaliatory termination, the burden shifts to the employer to produce a legitimate, non-retaliatory reason for the termination. *Guessous*, 828 F.3d at 217. Upon production of a legitimate, non-retaliatory reason, "burden then shift[s] back to [the plaintiff] to show this reason was a pretext to disguise the true retaliatory reason for [his] termination." *Id.*

1.  Retaliation under the DCHRA and § 1981

Samirah contends that he "opposed" Defendants' discrimination in April and May of 2019 by "calling out Powell's bigoted statements, complaining to Kimmel about racial discrimination, and complaining to Defendants Kimmel, Seifi and Powell about islamophobia—specifically being called a terrorist by Figueroa, and continuing to object to being called 'Abraham' by Kimmel and Seifi." Samirah Interrogatory Resp. No. 24. During the meeting with Defendants in mid-May 2019, Samirah stated that "racism had been unaddressed" and "protested that Celine Figueroa had suggested [Samirah] could be a terrorist in a clear reference to [his] race and religion." Samirah Decl., ECF No. 102-1, at ¶ 120. Shortly after making a discrimination complaint during the mid-May meeting, Samirah was terminated in June. Ex. O. Given the short period of time between the protected activity and Samirah's subsequent termination, Samirah has demonstrated a sufficient causal relationship between the two for purposes of a prima facie case.

Because Samirah has presented a prima facie case of retaliation, the burden now shifts to the employer to present a legitimate, non-retaliatory reason for Samirah's termination. As explained in Part IV.B *supra*, Defendants offer several legitimate reasons for Samirah's termination supported by record evidence. Specifically, Samirah's copying patient information notwithstanding directions to stop, his general tardiness, his failure to take intra-oral photos as instructed, and his unprofessional statements toward and around patients. None of the proffered reasons for termination reflect any retaliatory animus or motivation, and Samirah fails to offer any evidence that these reasons were a pretext for retaliation.

Accordingly, summary judgment shall be granted in Defendants' favor on Count V.

### 2. Retaliation under the DCWPCL

In Count VI, Samirah asserts that the termination of his employment was in retaliation for complaints about compensation. Samirah contends that his May 27, 2019, email to Kimmel

complaining about a "massive degree of reduction in [his] current salary … due to merchant fees and lab fees" is sufficient to show that he engaged in a protected activity under the DCWPCL. Def. Ex. N at 4. The Court disagrees. The exhibit containing the May 27, 2019, email shows a follow-up communication in which Samirah asks that the parties *amend the contract* to increase his compensation rate on net collections. Ex. N.at 4. And Samirah's deposition testimony confirms that compensation complaints he made to Powell in April 2019 were "based off of the lack of 48 clinical hours being provided to me as an employee." Samirah Dep. at 177:7. As discussed in Part IV.A *supra*, Samirah's disputes with Defendants over compensation did not concern any alleged failure to Samirah wages he earned through work; they concerned the number of hours he claims to have been promised in his employment contract. Likewise, there is no evidence that Samirah's complaints to Defendants about compensation were based on Defendants having failed to compensate him for the work performed. To the contrary, Samirah admits that he was paid for hours he worked providing services to patients and signed off on all of his paystubs. Def. Ex. B. at 2; Def. Ex. P. Samirah's complaints were demands to protect his contractual rights under his employment agreement—not his statutory rights under the DCWPCL. Thus, there is no evidence that Samirah engaged in any activity protected under the DCWPCL, and, therefore, he fails to present a prima facie case of retaliation. Defendants are therefore entitled to summary judgment on Count VI.

### D.  Count VII: Retaliatory Threats and Counterclaims

In Count VII of the Amended Complaint, Samirah asserts a claim that Defendants threatened, and DS eventually filed, counterclaims against him in this action in retaliation for his suit against them. In January and February 2021, after Samirah filed this action, counsel for the parties corresponded in an effort to settle the matter. *See* Def. Ex. T, ECF 92-44; Pl. Ex. 10, ECF

102-10. In two of their letters to Samirah's counsel, Defendants' counsel stated an intention to file the potential counterclaims against Samirah and the damages that they would seek. *Id.* The potential counterclaims included intentional infliction of emotional distress ("IIED"), misappropriation of trade secrets, and enforcement of the employment agreement's provision for attorney's fees. *Id.* Although the IIED counterclaim was never filed, DS did file counterclaims for breach of contract and misappropriation of trade secrets on June 30, 2022, ECF 34, and reasserted them in response to Samirah's Amended Complaint, ECF 62. Each party seeks summary judgment in their favor on Count VII of the Amended Complaint.

An employer's counterclaim against an employee "can constitute an act of unlawful retaliation under another federal statute governing employment rights when the lawsuit is filed with a retaliatory motive and lack[s] a reasonable basis in fact or law." *Darveau v. Detecon, Inc.*, 515 F.3d 334, 341 (4th Cir. 2008) (citing *Bill Johnson's Rests. v. NLRB*, 461 U.S. 731, 744 (1983)). A suit has a reasonable basis in law "if there is any realistic chance that the plaintiff's legal theory might be adopted." *Castillo v. Joann Urquhart, M.D., P.C.*, 855 F. App'x 877, 879 (4th Cir. 2021) (citing *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 (1983)).

The Court finds there is no genuine dispute of reasonable fact that each of the three of the threatened counterclaims has a reasonable basis in fact or law.

### 1. DS's Counterclaim for Breach of Contract

DS's counterclaim for breach of contract clearly has a reasonable basis in fact and law. DS did not merely threaten but filed this counterclaim against Samirah in this action. Counterclaim, ECF 62, ¶¶ 334–346. This counterclaim alleges that Samirah breached the same employment agreement at issue in Samirah's claim for breach of contract against DS in Count I of the Amended Complaint. Specifically, DS's counterclaim alleges that Samirah breached the employment

agreement in several ways, including by failing to provide advance notice of his running for elective office, as required by § 7; and copying and taking sensitive patient information, as prohibited by § 13.3; and other acts and omissions, including various forms of unprofessional conduct. Counterclaim ¶¶ 334–346.

The employment agreement at issue in DS's counterclaim is governed by District of Columbia law. Def. Ex. W, § 15.3. "Under District of Columbia law, a party asserting breach of contract must prove four elements: (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *CorpCar Servs. Houston, Ltd. v. Carey Licensing, Inc.*, 325 A.3d 1235, 1244–45 (D.C. 2024) (quoting *Weatherly v. Second Nw. Coop. Homes Ass'n*, 304 A.3d 590, 595 (D.C. 2023)) (cleaned up).

A reasonable basis for the first element is established by the copy of the employment contract attached to Defendants' counterclaim and motion papers, which reflects an agreement between Samirah and DS. *See* Def. Ex. W. Moreover, each party is suing on the employment agreement, indicating no dispute as to its validity as a contract.

As to the second element, a reasonable basis is established by the language of the agreement setting forth various obligations and duties on Samirah. DS has at least a realistic chance of prevailing in its interpretation of Section 7 of the agreement as obligating Samirah to provide written notice and seek advance approval before engaging in professional activities outside the practice of dentistry, such as running for elective office. *See* Def. Ex. W § 7. DS also has a realistic chance of prevailing in its interpretation of Section 13.3 as prohibiting Samirah from collecting patient data. *See id.* § 13.3.5.

A reasonable basis for the third element is established by record evidence that Samirah failed to provide advance notice of his running for elective office as well as his copying of patient information on the date of his termination. Def. Ex. AA; Samirah Dep. at 213:1-2, 213:17-19; Kimmel Dep. at 200:6-7, 227:8-11; Seifi Dep. at 31:11-18, Video 5.

Finally, as to the fourth element—damages—the absence of specific monetary injury does not prevent the accrual of a cause of action for breach of contract[]" because "[e]ven where monetary damages cannot be proved, a plaintiff who can establish a breach of contract is entitled to an award of nominal damages." *Wright v. Howard Univ.*, 60 A.3d 749, 753 (D.C. 2013); *see also Klayman v. Jud. Watch, Inc.*, 255 F. Supp. 3d 161, 167 (D.D.C. 2017).

Moreover, it is important to note that DS's counterclaim for breach of contract is compulsory, as it "arises out of the transaction or occurrence that is the subject matter" of Samirah's breach-of-contract claim, and it "does not require adding another party over whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13(a)(1). Courts have held that a defendant's "filing of a compulsory counterclaim is a particularly unlikely basis for a retaliation claim" because the defendant "must bring compulsory counterclaims or risk waiving them." *Ergo v. Int'l Merch. Servs., Inc.*, 519 F. Supp. 2d 765, 780–81 (N.D. Ill. 2007). Moreover, the plaintiff against whom the counterclaim is asserted has already hired a lawyer and asserted his own rights and therefore would not be caused to "incur significant additional expenses[.]" *Id.*

In sum, DS's counterclaim for breach of contract has a reasonable basis in law and fact and therefore cannot support a claim for retaliation.

2.  <u>DS's Counterclaim for Misappropriation of Trade Secrets</u>

DS's counterclaim for misappropriation of trade secrets also has a reasonable basis in fact and law. DS filed this counterclaim against Samirah pursuant to the employment contract and the D.C. Uniform Trade Secrets Act. Counterclaim ¶¶ 347–48.

Under the D.C. Uniform Trade Secrets Act, a complainant may recover damages for misappropriation of trade secrets. D.C. Code Ann. § 36-403. "Trade secret" is defined in the statute as "information . . . that: (A) [d]erives actual or potential independent economic value, from not being generally known to, and not being readily ascertainable by, proper means by another who can obtain economic value from its disclosure or use; and (B) [i]s the subject of reasonable efforts to maintain its secrecy." D.C. Code Ann. § 36-401(4). "Misappropriation" is defined to include "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means[.]" D.C. Code Ann. § 36-401(2)(A). "Improper means" is defined to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* § 36-401(1).

Here, Defendants establish a reasonable basis in fact and law that its sensitive patient information merits protection as a trade secret. First, courts have recognized such information to constitute trade secrets. *See, e.g.*, *Maryland Physician's Edge, LLC v. Behram*, Civ. No. DKC 17-2756, 2019 WL 4573417, at *5–6 (D. Md. Sept. 20, 2019). Additionally, the parties' employment contract expressly prohibits Samirah from "assembling or creating patient lists containing patient data," Def. Ex. W, § 13.3.5, reflecting a reasonable effort by DS to maintain the secrecy of this information, which may reasonably provide "actual or potential independent economic value" by virtue of its secrecy, D.C. Code Ann. § 36-401(4). Further, there is record evidence indicating that Samirah acquired patient information through "improper means" by locking himself in a room and

copied sensitive patient information on the date of his termination, notwithstanding Kimmel's commands that he stop.

In sum, DS's counterclaim for misappropriation of trade secrets has a reasonable basis in law and fact and therefore cannot support a claim for retaliation.

### 3.   DS's Potential Counterclaim for Intentional Infliction of Emotional Distress

Finally, Defendants had a reasonable basis in fact and law to assert a potential claim for IIED, although they did not ultimately assert one. "To succeed on [a] claim of intentional infliction of emotional distress [under District of Columbia law], a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *District of Columbia v. Tulin,* 994 A.2d 788, 800 (D.C. 2010) (quoting *Minch v. District of Columbia,* 952 A.2d 929, 940 (D.C.2008))."

In an email to Samirah's counsel on February 1, 2021, Defendants' counsel stated that they were in possession of video footage showing "Samirah masturbating in the business office" and intended to assert an IIED counterclaim based on that conduct. Ex. T. Counsel argued in the letter that Samirah's conduct "was extreme, outrageous, highly inappropriate, and beyond all bounds of decency for a work environment[,]" and noted Samirah's awareness of a surveillance camera that captured the footage and that Defendants "monitored and reviewed the surveillance footage daily." *Id*. Record evidence establishes further that, at the time the footage was captured, a patient was in a room nearby, waiting to be seen by him. Kimmel Dep. at 241:6. The Court finds reasonable grounds for a fact-finder to deem Samirah's conduct "extreme and outrageous" for a professional setting when a patient was waiting. Kimmel testified in her deposition that viewing the footage "completely shifted the way [she] operated and how [she] work[ed]." *Id*. at 240:18-19. Further, she testified that it gave her anxiety and that she could not comprehend "how . . . a doctor [could]

masturbate . . . with his bare hands before sticking those same hands in a patient's mouth within minutes." *Id.* at 241:4-6. Finally, Samirah's awareness of the surveillance camera provides a reasonable basis for finding his conduct to have been intentional or at least reckless. Thus, Defendants' potential counterclaim for IIED has a reasonable basis in law and fact and therefore cannot support Samirah's retaliation claim.

For the foregoing reasons, Samirah cannot succeed on the retaliation claim asserted in Count VII. Defendants are entitled to summary judgment on this count.

### E.  Count I: Breach of Contract

Having granted summary judgment in favor of Defendants on Counts II through VII of the Amended Complaint, the sole remaining count is Samirah's claim in Count I against DS for breach of contract under D.C. law. DS's counterclaims against Samirah are also based solely on D.C. law. The Court declines to exercise jurisdiction over these claims.

This Court has original jurisdiction over federal claims under 28 U.S.C. § 1331, which "confers upon district courts 'original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.'" *ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 394 (4th Cir. 2012) (quoting 28 U.S.C. § 1331). Federal district courts do not have original jurisdiction over state-law claims, unless the requirements of 28 U.S.C. § 1332(a) are satisfied, and those requirements are not satisfied in this case. *See* 28 U.S.C. § 1332(a) (conferring original jurisdiction of civil actions between parties of diverse citizenship where the matter in controversy exceeds $75,000). This Court may only adjudicate the parties' D.C. law-based claims through its supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). A district court may exercise supplemental jurisdiction of claims for which it lacks original jurisdiction if those claims "are so

related to claims in the action within [its] original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a).

However, § 1367(c)(3) provides that a district court "may decline to exercise supplemental jurisdiction over a claim" when it has "dismissed all claims over which it has original jurisdiction." The Fourth Circuit has recognized that a district court has "wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Henderson v. Harmon*, 102 F.4th 242, 251 (4th Cir. 2024) (quoting *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995)). "That said, generally, when a district court dismisses all federal claims in the early stages of litigation—e.g., at the summary-judgment stage—it should decline to exercise jurisdiction over any remaining pendent state law claims." *Id.* (cleaned up); *accord Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."). The Court may exercise its discretion by remanding a case in a removed action. *Open Just. Baltimore v. Baltimore City L. Dep't,* Civ. No. ELH-22-1901, 2023 WL 5153654, at *28 (D. Md. Aug. 10, 2023), *aff'd*, No. 23-2293, 2024 WL 5182408 (4th Cir. Dec. 20, 2024) (citing *Carnegie-Mellon Univ.*, 484 U.S. at 353–57).

In weighing judicial economy, convenience, fairness, and comity, *Carnegie-Mellon Univ.*, 484 U.S. at 350 n.7, this Court finds that these factors weigh in favor of remanding the remaining D.C.-law claims back to D.C. Superior Court. The Supreme Court has stated, "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of*

*America v. Gibbs*, 383 U.S. 715, 726 (1966). Remanding the remaining D.C.-law claims will do just that. Therefore, the remaining claims and counterclaims in Count I of the Amended Complaint and DS's counterclaims are remanded to the Superior Court of the District of Columbia.

**V.      CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED as to Counts II through VII of Samirah's Amended Complaint.

A separate Order has issued. Count I of the Amended Complaint and DS's Counterclaims are REMANDED to the Superior Court of the District of Columbia. The Clerk shall CLOSE this case.

DATE: 4/4/25

_____
Matthew J. Maddox
United States District Judge